## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| **LUCIA GONCALVES OLIVEIRA, et al.,** | ) | |
|  | ) | |
| **Plaintiffs,** | ) | |
|  | ) | **Civil Action No.** |
| **v.** | ) | **25-13228-BEM** |
|  | ) | |
| **JOSEPH B. EDLOW, et al.,** | ) | |
|  | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

### MEMORANDUM AND ORDER ON
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**MURPHY, J.**

Congress implemented the Victims of Trafficking and Violence Protection Act ("VTVPA") to "strengthen the ability of law enforcement agencies to detect, investigate, and prosecute cases of domestic violence [and] sexual assault." Pub. L. No. 106-386, § 1513(a)(2)(A), 114 Stat. 1464. Its purpose is to "facilitate the reporting of crimes to law enforcement officials" by "[p]roviding temporary legal status to aliens who have been severely victimized by criminal activity." *Id.* § 1513(a)(2)(B). Among other benefits, the VTVPA encourages victims to "fully participate in the investigation of the crimes committed against them and the prosecution of the perpetrators of such crimes." *Id.* § 1513(a)(1)(B).

Plaintiff Lucia Goncalves Moreira Oliveira presents a tragic success story for the VTVPA. On August 20, 2023, Ms. Oliveira was robbed and sexually assaulted on the streets of Boston, Massachusetts. For any survivor of such an ordeal, the decision of whether to call the police is often fraught with difficulty, both because of the intense emotional charge of the situation and because of the considerable challenges in prosecuting crimes of that nature. Indeed, from

2020–2023, only 13% of sexual assaults in urban areas were ever reported.[1]  For Ms. Oliveira, the prospect may have been exceptionally daunting because she was then the subject of immigration proceedings.  Many in her position might have felt understandably apprehensive about inviting law enforcement into the most sensitive parts of their life.  But rather than let her attacker disappear into the night, Ms. Oliveira did the right thing: she contacted the authorities and has since fully cooperated with law enforcement.  By doing so, she contributed to our collective safety.  Indeed, a Boston Police detective has signed an affidavit attesting to Ms. Oliveira's ongoing, active participation in their investigation.

Under the VTVPA, cooperating victims like Ms. Oliveira are entitled to apply for what is known as a U visa.  As set forth above, U visas serve a dual purpose: providing humanitarian relief to victims of abuse and facilitating those victims' participation in criminal investigations, much to the benefit of our communities.  And while an annual cap on U visas has unfortunately meant a years-long backlog of applications, the Department of Homeland Security ("DHS") has, until recently, ensured that qualifying individuals would not be removed while waiting for final relief.

On January 30, 2025, DHS abruptly eliminated that benefit when Immigration & Customs Enforcement ("ICE") announced that it would no longer ask its DHS-sister agency, U.S. Citizenship & Immigration Services ("USCIS"), to decide whether a U visa application is "bona fide"—meaning whether it satisfies the prima facie requirements for relief, plus national security and public safety background checks for the applicant—before executing the applicant's order of removal.  As a result, individuals with bona fide, yet unadjudicated, U visa applications—"victims of crimes committed against them in the United States, including rape, torture, kidnaping,

---

[1] Bur. of Just. Stat., *Reporting to Police by Type of Crime and Location of Residence*, 2020–2023 (NCJ 310166, 2025), https://bjs.ojp.gov/library/publications/reporting-police-type-crime-and-location-residence-2020-2023 [https://perma.cc/4CZN-BYPE].

trafficking, incest, domestic violence, sexual assault, female genital mutilation, forced prostitution, involuntary servitude, being held hostage," and more—suddenly find themselves unprotected from removal.[2]  Indeed, this is the exact position in which Ms. Oliveira finds herself.  Ms. Oliveira's U visa application was submitted to USCIS *ten months ago*, almost quintuple what Congress imagined as an appropriate length for deciding interim relief.[3]  Nevertheless, it has not been enough, and Ms. Oliveira's application continues to be outstanding.

Through their complaint, Ms. Oliveira and her husband ask the Court to find that the rescission of ICE's prior policy and the institution of its new policy (hereinafter, the "2025 Policy") violated the Administrative Procedure Act ("APA") and the Due Process Clause.  In the interim, Plaintiffs ask the Court preliminarily to enjoin ICE from applying the 2025 Policy in their case.

At this stage, Defendants' primary argument against relief is jurisdictional.  Defendants construe Plaintiffs' claims as seeking review of a discretionary decision to execute Plaintiffs' orders of removal, barred under 8 U.S.C. § 1252(g) ("section 1252(g)").  However, the Court finds this argument unpersuasive.  Plaintiffs challenge DHS's effective "revo[cation] [of] a deferred action program," which the Supreme Court has held does not fall within the "narrow" scope of section 1252(g).  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020).

On the merits, Plaintiffs' APA claim is particularly strong.  ICE's announcement of the 2025 Policy summarily states that "it is the policy of the United States to achieve the 'total and

---

[2] Pub. L. No. 106-386, § 1513(a)(1)(A), 114 Stat. 1464.

[3] *See* 154 Cong. Rec. 10905 (2008) ("Immigrant victims of domestic violence, sexual assault and other violent crimes should not have to wait for up to a year before they can support themselves and their families.  [USCIS] should therefore strive to issue work authorization and deferred action in most instances within 60 days of filing, consistent with the need for safe and competent adjudication.").

efficient enforcement of [immigration] laws.'"[4]  But the VTVPA (including the availability of interim relief) is part of our immigration laws.  It is thus unclear how its implementation could ever be at odds with DHS's purported goal.  Moreover, neither the announcement, nor the Executive Order it cites, gives any indication that DHS has considered how its new policy will impact the VTVPA's law-enforcement and humanitarian aims, let alone the "serious reliance interests" with which all agencies are required to reckon.  *Id.* at 30 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016)).

The other preliminary injunction factors weigh likewise in favor of relief.  Removal would irreparably harm Plaintiffs by precluding them from receiving interim U visa relief to which they may be entitled.  And while "[t]here is always a public interest in prompt execution of removal orders," *Nken v. Holder*, 556 U.S. 418, 436 (2009), Congress has specifically identified here a public interest in "women and children . . . [being] able to report [violent and sexual] crimes to law enforcement and fully participate in the . . . prosecution of the perpetrators of such crimes."[5] Put simply, if Ms. Oliveira is removed, it becomes virtually certain that a sexual predator is never brought to justice, and it becomes more likely that the next person in her position sees no reason to jeopardize their own privacy and well-being for our collective safety.  Congress passed the VTVPA to avoid precisely this result.

For these reasons, and those stated herein, the Court will grant Plaintiffs' motion and enjoin DHS from relying on the 2025 Policy in the administration of their removal.

---

[4] U.S. Immigr. & Customs Enf't, Directive 11005.4, *Interim Guidance on Civil Immigration Enforcement Actions Involving Current or Potential Beneficiaries of Victim-Based Immigration Benefits* [hereinafter, "ICE Directive 11005.4"] at 2 (quoting *Protecting the American People Against Invasion*, Exec. Order No. 14159, 90 Fed. Reg. 8443, 8443 (Jan. 29, 2025)), https://www.ice.gov/doclib/foia/policy/11005.4.pdf [https://perma.cc/ET7M-HPQX].

[5] Pub. L. No. 106-386, § 1513(a)(1)(B), 114 Stat. 1464.

# I.    Background

## A.    Legal and Factual Background

### 1.    U Visas and Interim Relief (2000 – 2021)

Congress created the U visa in 2000 to provide "temporary legal status," with a pathway to lawful permanent residency, for non-citizen crime victims who assist law enforcement in their investigations.[6]  However, each year, only 10,000 U visas are available, creating a backlog of applications and a recognized need for interim relief.[7]

In 2008, Congress partially filled this gap by authorizing DHS to grant stays of removal to U visa applicants who have demonstrated "prima facie" eligibility for approval, 8 U.S.C. § 1227(d), and work authorization for applicants with "bona fide" claims, *id.* § 1184(p)(6).[8]  In 2021, DHS exercised its authority under these statutes by implementing a specific process by which USCIS would make such Bona Fide Determinations ("BFD") on U visa applications.[9]

---

[6] Pub. L. No. 106-386, § 1513(a)(2)(B), 114 Stat. 1464.

[7] *See New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status*, 72 Fed. Reg. 53014, 53027 (September 17, 2007) (citing 8 U.S.C. § 1184(p)(2)).

[8] From 2000–2007, DHS independently instituted its own "procedures to ensure that those aliens who appeared to be eligible for U nonimmigrant status . . . would not be removed from the United States until they had an opportunity to apply for such status."  *See* 72 Fed. Reg. at 53015 (citing prior guidance).  Since 2007, USCIS has also maintained a "waiting list," entitling applicants to interim relief pending visa availability.  *See id.* at 53033.

[9] U.S. Citizenship & Immigr. Servs., Policy Alert PA-2021-13, *Bona Fide Determination Process for Victims of Qualifying Crimes, and Employment Authorization and Deferred Action for Certain Petitioners* (June 14, 2021), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20210614-VictimsOfCrimes.pdf [https://perma.cc/38DB-7FYY].  "Where USCIS issues a [Bona Fide Determination Employment Authorization Document] to a petitioner, the petitioner is also considered to have established a prima facie case for approval within the meaning of [8 U.S.C. § 1227(d)(1)]."  3 U.S. Citizenship & Immigr. Servs., *Policy Manual* pt. C, ch. 5 (Nov. 27, 2025), https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-5 [https://perma.cc/PFP2-Z8LL].

During the BFD process, USCIS first determines whether a pending petition is bona fide. Second, USCIS, in its discretion, determines whether the petitioner poses a risk to national security or public safety, and otherwise merits a favorable exercise of discretion. If USCIS grants the alien a Bona Fide Determination Employment Authorization Document (BFD EAD) as a result of the BFD process, USCIS then also exercises its discretion to grant that alien deferred action for the period of the BFD EAD. . . .

As a primary goal, USCIS seeks to adequately evaluate and adjudicate petitions as efficiently as possible. The BFD process provides an opportunity for certain petitioners to receive BFD EADs and deferred action while their petitions are pending, consistent with the William Wilberforce Trafficking Victims Reauthorization Act of 2008 (TVPRA 2008).

Only petitioners living in the United States may receive BFD EADs, since those outside the United States cannot as a practical matter work in the United States. Likewise, deferred action can only be accorded to petitioners in the United States since those outside the United States have no potential removal to be deferred.[10]

Also in 2021, DHS announced that ICE would exercise its discretion to "defer decisions on civil immigration enforcement action against [a U visa] applicant . . . until USCIS ma[de] a . . . [n]egative bona fide determination or waiting list determination for pending U visa petitions . . . request[ing] that USCIS expedite the adjudicative action" as needed.[11]  Under this 2021 Policy,

---

[10] 3 U.S. Citizenship & Immigr. Servs., *Policy Manual* pt. C, ch. 5 (Nov. 27, 2025), https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-5 [https://perma.cc/PFP2-Z8LL].

[11] U.S. Immigr. & Customs Enf't, Directive 11005.3, *Using a Victim-Centered Approach with Noncitizen Crime Victims* §§ 2.1, 5.4 (Dec. 2, 2021), https://www.ice.gov/doclib/foia/policy/11005.3_UsingVictimCenteredApproachNoncitizenVictims.pdf [https://perma.cc/2B4K-5GAU].

except in "exceptional circumstances," non-citizens with pending U visa applications "should generally be issued a stay of removal," unless a negative BFD has already been made.[12]

### 2.    Plaintiffs' History (2021 – 2024)

In November 2021, Plaintiffs (Mr. and Ms. Oliveira) entered the United States at the southern border.  *See Oliveira et al v. Lyons et al*, No. 1:25-cv-12859-LTS, Dkt. 11 at 2 (D. Mass. Oct. 24, 2025).[13]  Soon thereafter, Plaintiffs were encountered by U.S. Customs and Border Protection ("CBP"), which initiated removal proceedings against them.  *Id.*  Plaintiffs were then released, subject to monitoring and check-in requirements, with which Plaintiffs have since duly complied.  *Id.*

Two years later, on or about August 20, 2023, Ms. Oliveira was robbed and sexually assaulted in public in Boston, Massachusetts.  *Id.*[14]  She has since fully cooperated with that criminal investigation, as attested by a Boston Police detective.  *Id.*[15]  Following that incident,

---

[12] *Id.* § 5.4.  Indeed, the 2021 Policy substantially mirrored a prior ICE policy from before the BFD process was established, which relied on the lesser "prima facie" standard, per 8 U.S.C. § 1227(d), and which ran from 2009 to 2019.  *See* U.S. Immigr. & Customs Enf't, Directive 11005.1, *Guidance: Adjudicating Stay Requests Filed by U Nonimmigrant Status (U-Visa) Applicants* at 2–3 (Sept. 24, 2009), https://www.ice.gov/doclib/foia/dro_policy_memos/11005_1-hd-stay_requests_filed_by_u_visa_applicants.pdf [https://perma.cc/HK34-H3C8].  In August 2019, in a parallel turn of events, DHS rescinded this policy and announced that ICE would "no longer routinely request prima facie determinations nor expedited adjudications from USCIS." *See* U.S. Immigr. & Customs Enf't, Directive 11005.2, *Stay of Removal Requests and Removal Proceedings Involving U Nonimmigrant Status (U Visa) Petitioners* §§ 2, 5.2.2 (Aug. 2, 2019), https://www.ice.gov/doclib/foia/policy/11005.2_StayRemovalReqRemProcUVisaPetitioners.pdf [https://perma.cc/249E-4J6H].  Like Directive 11005.4, Directive 11005.2 was challenged in court.  *See generally, e.g.*, *ASISTA Immigration Assistance, Inc. v. Johnson*, No. 3:20-cv-00206-JAM (D. Conn.).  However, following a change in administration, Directive 11005.2 was stayed and subsequently superseded by the 2021 Policy.

[13] *See also* Dkt. 1 ¶ 31.  As discussed in Section I(A)(4), Plaintiffs' personal narratives were recently set forth by another session of this court in connection with habeas petitions.  Here, the Court recites only an abbreviated version, incorporating other facts as necessary.

[14] *See also* Dkt. 1 ¶ 34.

[15] *See also* Dkt. 2 at 3.

Plaintiffs hired an attorney to file U visa applications on their behalf.[16] *Id.* However, unbeknownst to Plaintiffs, their attorney never filed the paperwork, and on January 16, 2025, Plaintiffs were ordered removed.[17]

### 3.    The 2025 Policy

On January 30, 2025, ICE rescinded its 2021 Policy:

On January 20, 2025, President Donald J. Trump issued an Executive Order (EO) entitled "Protecting the American People Against Invasion," which states it is the policy of the United States to achieve the "total and efficient enforcement of [immigration] laws" against all inadmissible and removable aliens. Accordingly:

. . .

ICE will no longer routinely request expedited adjudications from USCIS. ICE officers and agents may continue to do so subject to a case-by-case determination that it is in ICE's best interests.[18]

The announcement itself makes no mention of non-citizens' willingness to report or participate in criminal investigations or of any victims' reliance interests.

The Executive Order quoted in the announcement makes no mention itself of U visas or qualifying victims. Rather, it presents as its rationale that certain non-citizens present in the United States constitute "significant threats to national security and public safety" or have otherwise "abused the generosity of the American people," requiring the "efficient and expedited removal of

---

[16] Mr. Oliveira is putatively a "[q]ualifying family member" who may pursue interim and final U visa relief in conjunction with his wife. *See* 8 C.F.R. §§ 214.14(a)(10), 214.14(f).

[17] *See* Dkt. 1 ¶¶ 35–38. The Court further notes an immaterial discrepancy in the record. An affidavit submitted by the respondents in Plaintiffs' habeas action states that Plaintiffs were ordered removed in August 2024 and that their appeal was dismissed by the Board of Immigration Appeals on January 16, 2025. *See Oliveira*, No. 1:25-cv-12859-LTS, Dkt. 11 at 2. In their current complaint, Plaintiffs state that their merits hearing was in August 2024; that they were ordered removed on January 16, 2025; and that their prior attorney failed to inform them of the deadline to appeal. Dkt. 1 ¶¶ 35–38. These differences appear to have no bearing on the legal analysis, so the Court will use Plaintiffs' complaint version of events.

[18] ICE Directive 11005.4 at 3.

aliens from the United States."[19]    As such, the Order states that agencies should take "all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States."[20]    Furthermore, the Order instructs agencies to "ensur[e] that . . . employment authorization is not provided to any unauthorized alien in the United States," presumably in consideration of the "economic well-being of Americans."[21]

### 4.    **Plaintiffs' Controversy**

On or about March 19, 2025, and notably before any departure order was issued by ICE, Plaintiffs hired new counsel and filed their U visa applications.    *See Oliveira*, No. 1:25-cv-12859-LTS, Dkt. 11 at 3.[22]  On April 4, 2025, ICE gave Plaintiffs an initial departure plan, with a departure date of May 2, 2025.  *Id.*[23]  Following two motions to reopen—the first of which resulted in a stay of removal but was ultimately unsuccessful; the second of which remains pending before the Board of Immigration Appeals—ICE gave Plaintiffs a final self-deportation deadline of October 3, 2025.  *Id.*

However, on October 2, 2025, Plaintiffs filed habeas petitions, "target[ing] ICE's efforts to remove Petitioners while they still have pending requests" for relief.  *Id.* at 3–4.  Another session of this court denied those petitions, stating that it was "not empowered via its habeas jurisdiction" to grant relief but that, "[t]o the extent [Plaintiffs] wish to assert general civil (non-habeas) claims,

---

[19] 90 Fed. Reg. at 8443, 8445.

[20] *Id.* at 8445.

[21] *Id.* at 8446.

[22] *See also* Dkt. 1 ¶ 39.

[23] *See also Oliveira et al v. Lyons et al*, No. 1:25-cv-12859-LTS, Dkt. 8 ¶ 16 (D. Mass. Oct. 9, 2025).

they may do so by filing a civil complaint," as to the potential merits of which the court expressed "no view." *Id.* at 8 & n.8.

### B.    **Procedural Background**

Following dismissal of their habeas petitions, on October 31, 2025, Plaintiffs filed the instant action. Dkt. 1. Plaintiffs assert one claim each under the APA, *id.* ¶¶ 49–57; under 8 U.S.C. § 1227(d), *id.* ¶¶ 58–62; under the Due Process Clause, *id.* ¶¶ 63–72; and for a writ of mandamus, *id.* ¶¶ 73–77. For their APA claim, on which the Court focuses in this decision, Plaintiffs assert that the 2025 Policy constitutes final agency action "because it marks the consummation of Respondents' decision-making process and is an action 'from which legal consequences will flow,'" *id.* ¶ 51 (internal quotation marks omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 156 (1997)), and that "Defendants' scant reasoning [for the 2025 Policy] fails the APA's 'requirement that [the agency] provide a reasoned explanation for its action' and is therefore arbitrary and capricious," *id.* ¶ 54 (quoting *Regents*, 591 U.S. at 35).

Plaintiffs further moved for a temporary restraining order and preliminary injunction, asking the Court to "enjoin[] [Defendants] from further immigration enforcement actions until they complete the BFD process." Dkt. 2 at 7. The Court then issued a temporary restraining order to preserve the status quo and to give it time to assess its own jurisdiction. Dkt. 5.[24]

To that end, the Court also ordered Plaintiffs to show cause for why this case should not be dismissed pursuant to section 1252(g).[25] *Id.* Both sides responded, Dkts. 8, 13, and, with leave, the American Civil Liberties Union of Massachusetts filed an amicus brief, Dkts. 9–10, 14.

---

[24] That temporary order was later extended until December 3, 2025, to give the Court time to consider the issues raised in Plaintiffs' motion. Dkts. 14, 16, 19.

[25] In his decision on Plaintiffs' habeas petitions, Judge Sorokin highlighted section 1252(g) as a potential barrier to relief. *See Oliveira*, No. 1:25-cv-12859-LTS, Dkt. 11 at 6. The Court thus felt it appropriate to ensure that there was a colorable basis for jurisdiction before making Defendants spend time and resources on a response.

Satisfied that there was at least a colorable basis on which to proceed, the Court ordered Defendants to respond to the motion for preliminary injunction, Dkts. 14, 17.[26] On November 19, 2025, the Court held a hearing and took the motion under advisement.  Dkt. 18.[27]

## II.    Legal Standard

"[T]he issuance of preliminary injunctive relief is 'an extraordinary and drastic remedy that is never awarded as of right.'"  *Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT*, 440 F. Supp. 3d 99, 102 (D. Mass. 2020) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012)).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  However, "in a case like this one, where the Government is the party opposing the preliminary injunction," the last two factors merge.  *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken*, 556 U.S. at 435).

Of the four factors, likelihood of success "weighs most heavily" in the analysis.  *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).  In deciding a motion for preliminary injunction, the Court "has broad discretion in deciding what evidence to consider."  *Rice v. Wells*

---

[26] As noted elsewhere in this opinion, Defendants' opposition focuses almost exclusively on section 1252(g), to the exclusion of virtually any other likelihood-of-success argument, even though Defendants already had a separate opportunity to brief that issue. In the interest of fairly assessing Plaintiffs' actual likelihood of success, the Court has done its best to shadowbox in Defendants' place, as appropriate, and anticipates that it may need to revisit several of these issues later in the case as Defendants' position becomes clearer.

[27] On December 3, 2025, the Court granted Plaintiffs' motion, upon the findings and conclusions expressed herein, stating that a full written decision was forthcoming.  Dkt. 23.  The Court notes that the December 3, 2025 docket order refers to "ICE Directive 11005.4, including its rescission of ICE Directive 11005.3," whereas the Court here refers to the "2025 Policy," which is defined in the introduction to include the rescission of the 2021 Policy.  To be clear, insofar as the Directives embody the Policies, the Court considers these orders to be substantively identical.

*Fargo Bank, N.A.*, 2 F. Supp. 3d 25, 31 & n.34 (D. Mass. 2014) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

III.    **Discussion**

A.    **Likelihood of Success**

The Court finds that Plaintiffs are likely to succeed, at a minimum, on their APA claim. The Court's federal-question jurisdiction is not withdrawn under section 1252(g), and Plaintiffs are likely to show that the issuance of the 2025 Policy, including the rescission of the 2021 Policy, was arbitrary and capricious, in violation of the APA.

1.    **Jurisdiction**

Defendants view Plaintiffs' claims as "arising from the decision or action" to "execute [their] removal orders," barred under section 1252(g).  *See* Dkt. 17 at 5–18.

However, Defendants' argument is undermined by a simple fact: Plaintiffs' APA claim crystalized on January 30, 2025, when the 2025 Policy was issued, before Plaintiffs were even aware of any 'decision' or 'action' to remove them.[28]  *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 804 (2024).  Before that date, Ms. Oliveira had already come forward and assisted law enforcement in their investigation.  Thus, she had already fulfilled her half of the 'quid pro quo' agreement undergirding the U visa program and so, on January 30, 2025, was "injured by final agency action" that withdrew part of the benefit to which she and her husband would have been otherwise entitled.  *See id.*; *see also McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 166 (1st Cir. 1987) (holding that the mere "threat of withdrawal of benefits constitutes a present legal harm" when circumstances make that "deprivation of certainty"

---

[28] *See Oliveira*, No. 1:25-cv-12859-LTS, Dkt. 11 at 3 ("In early April [2025], ICE notified Petitioners of a departure plan providing them four weeks to self-deport.").

meaningful).[29]  Even to the extent one might argue that Plaintiffs were not "injured" by the new

rule until after they officially submitted their U visa applications, on March 19, 2025, that timing

still demonstrates that the claim precedes—and thus cannot "aris[e] from"—the April 4, 2025

departure order.[30]

Defendants cannot sweep Plaintiffs' claims into section 1252(g)'s "narrow" scope by

appealing to the broader gestalt of removal.  *See Reno v. Am.-Arab Anti-Discrimination Comm.*,

525 U.S. 471, 482–83, 487 (1999).  Section 1252(g) "applies only to three discrete actions," not

implicated here: the "'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute*

removal orders.'"  *See id.* at 482 (quoting 8 U.S.C. § 1252(g) (emphases added)).  "It is implausible

that the mention of three discrete events along the road to deportation was a shorthand way of

referring to all claims arising from deportation proceedings."  *Id.*

The Supreme Court's decisions in *Reno* and *Regents* provide apt points of comparison.  In

*Reno*, a group of plaintiffs alleged that the Government had "target[ed] them for deportation

because of their affiliation with a politically unpopular group."  525 U.S. at 472.  Thus, the

"initiation of deportation" proceedings was the precise 'act' that the plaintiffs challenged, *id.* at

474, and the Supreme Court held that such claims, akin to a "selective prosecution" defense in the

criminal context, were "precisely" what section 1252(g)'s drafters intended to avoid, *id.* at 477,

---

[29] Defendants argue that, "if ICE agreed to wait to execute Plaintiffs' removal orders, Plaintiffs 'would have no "cause or claim" to pursue.'"  Dkt. 17 at 7 (quoting *Balogun v. Sessions*, 330 F. Supp. 3d 1211, 1212 (C.D. Cal. 2018)).  However, that is not necessarily right or even relevant.  If ICE simply canceled Plaintiffs' current deportation plan, without more, Plaintiffs would likely still have a claim based on a "deprivation of certainty."  *See McCuin*, 817 F.2d at 166.  And even to the extent Defendants might be correct, Plaintiffs' claim would likely fail for lack of standing, not because of any change in the Court's inherent jurisdiction—*i.e.*, *Plaintiffs* could not bring this lawsuit, but *another* party could.  ICE's mooting the action would not transform the nature of the underlying claims.

[30] While this timing is certainly sufficient to show the lack of any causal connection between the existence of Plaintiffs' claims and the decision to execute their orders of removal, it is worth noting that, even if there were some relationship between the two, that would still not necessarily be sufficient.  *See Kong v. United States*, 62 F.4th 608, 613 (1st Cir. 2023) (holding that a "but-for" causal connection is insufficient to satisfy section 1252(g)'s "arising from" language).

479.    By contrast, the *Regents* Court had no difficulty distinguishing the kind of selective-prosecution claim at issue in *Reno* from one more similar to Plaintiffs' here, an APA challenge to the rescission of the Deferred Action for Childhood Arrivals (DACA) program. *Regents*, 591 U.S. at 19 ("We have previously rejected as 'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.'" (quoting *Reno*, 525 U.S. at 482)).    In one sentence of analysis, the *Regents* Court summarily stated that "[t]he rescission, which revokes a deferred action program with associated benefits, is not a decision to 'commence proceedings,' much less to 'adjudicate' a case or 'execute' a removal order." *Id.*

Plaintiffs' case is much closer to *Regents* than *Reno*.[31]    Plaintiffs reasonably assert that the BFD process and 2021 Policy—implemented within months of each other, both under the auspices of DHS—"work together" to provide interim relief for eligible U visa applicants.    Dkt. 1 ¶ 55. That makes intuitive sense and is apparent, for example, in the fact that the BFD process combines the "prima facie" and "bona fide" determinations into a single adjudication.[32]    This may avoid duplication of efforts within DHS as it considers U visa applicants' eligibility for different kinds

---

[31] The Court notes that its analysis here bleeds into the related-but-distinct question of whether the 2021 and 2025 Policies constitute "agency action . . . committed to agency discretion by law" within the meaning of the APA. *See* 5 U.S.C. § 701(a)(2).  Indeed, the *Regents* Court devoted substantially more attention to this issue than its jurisdictional cognate. *See* 591 U.S. at 16–19.  That makes sense because the deportation process contains "many . . . decisions [and] actions," not necessarily encompassed within section 1252(g), that are arguably committed to agency discretion. *Reno*, 525 U.S. at 482.  Unfortunately, Defendants devote no attention to this broader question of reviewability, *see generally* Dkt. 17, and because the APA is not, strictly speaking, a jurisdictional statute, *see Califano v. Sanders*, 430 U.S. 99, 107 (1977), the Court is under no obligation to police its requirements independently.

Nevertheless, particularly in this preliminary, predictive posture, the Court finds it appropriate to assume that Defendants will at least make the same "chain of reasoning" argument put forth (unsuccessfully) in *Regents*: that "the rescission of a non-enforcement policy is no different . . . from the adoption of that policy," which adoption is itself "equivalent to . . . individual non-enforcement decision[s]" that have traditionally been considered non-reviewable under the APA. *See Regents*, 591 U.S. at 17–18.  However, for the reasons stated in this section, the Court finds that the 2025 Policy is "more than a non-enforcement policy," making APA review appropriate. *See id.* at 19.

[32] *See* note 9, *supra*.

of interim relief. However, it also introduces the obvious risk that an individual will be removed before the more-stringent BFD can be made, destroying the applicant's eligibility for either.[33] The 2021 Policy directly addresses that problem, effectively filling a gap within the BFD process. Thus, the 2025 Policy constitutes at least the partial rescission of the U visa interim relief system, "a program for conferring affirmative immigration relief," which offers the "types of benefits . . . 'courts are often called upon to protect.'" *Cf. Regents*, 591 U.S. at 18 (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)).[34]

Defendants' most tempting argument essentially asks the Court to set aside the finer points of section 1252(g) and locate the 'gist' of Plaintiffs' claim in their requests for relief.[35] But that mixes things up and puts the cart before the horse. "When asking if a claim is barred by § 1252(g), courts must focus on the action being challenged," not the "relief sought." *Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1257–58 (11th Cir. 2020).[36] This follows from the basic principle that a court's decision as to remedy "is, of course, different from [and subsequent to] the question [of] whether there is jurisdiction." *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 561 (1968).

---

[33] *See* note 10 and accompanying text, *supra*.

[34] For comparison, Plaintiffs' claim looks decidedly unlike those in *Reno*. Plaintiffs do not suggest that Defendants are "selectively" "targeting" them. *Cf. Reno*, 525 U.S. at 472, 474. And, unlike in *Reno*, adjudication will not require probing the sensitive, fact-intensive, subjective reasons behind the Government's "decision to prosecute." *Cf. id.* at 489–90 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).

[35] *See* Dkt. 17 at 7 ("But the relief sought by a plaintiff obviously relates to and sheds light on the action being challenged."). The Court notes that a different version of this argument (not made by Defendants) might ask whether any part of section 1252 "impliedly forbids the relief which is sought." *See* 5 U.S.C. § 702. However, also in this (non-jurisdictional) context, the Supreme Court has cautioned against "look[ing] only to the kind of relief a plaintiff seeks, rather than the type of grievance he asserts." *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 n.3 (2012).

[36] *See also Mingrone v. Adducci*, 2017 WL 4909591, at *4 (E.D. Mich. July 5, 2017) ("So the appropriate inquiry under § 1252(g) is not merely whether a stay would interfere with ICE's ability to execute the final removal order—the answer is 'yes'—but whether [the petitioner's] claim arises from ICE's execution of the final removal order." (citing *Mustata v. U.S. Dep't of Just.*, 179 F.3d 1017, 1022–23 (6th Cir. 1999))).

Section 1252(g) is a jurisdictional bar, not a remedial limitation. *Cf. Biden v. Texas*, 597 U.S. 785, 798 (2022) (discussing section 1252(f)). And in any event, the Court has broad discretion to ensure that any relief given is proper. *Rosario-Torres v. Hernandez-Colon*, 889 F.2d 314, 321 (1st Cir. 1989).

In sum, Plaintiffs challenge DHS's issuance of the 2025 Policy and, by extension, its rescission of the 2021 Policy. These are not "decision[s] or action[s] . . . to execute removal orders." *Cf.* 8 U.S.C. § 1252(g). And while Plaintiffs' APA framing certainly impacts what relief is available, it does not foreclose the Court's ability to prevent irreparable harm in this case.

### 2.    Merits

Plaintiffs assert that DHS's issuance of the 2025 Policy was arbitrary and capricious, in violation of the APA. Dkt. 1 ¶ 53 (citing 5 U.S.C. § 706(2)(A)). Defendants make no meaningful counter.[37] Nonetheless, the Court tests Plaintiffs' APA claim and finds it substantial.

### a.    Final Agency Action

To be reviewable under the APA, a challenged action must constitute "final agency action." 5 U.S.C. § 704. Agency action is considered "final" where it is "the 'consummation' of the agency's decision[-]making process," and an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett*, 520 U.S. at 178).

For purposes of this preliminary injunction, the Court is satisfied that Plaintiffs will be able to show that the 2025 Policy constitutes final agency action. As to the first *Bennett* prong, the 2025 Policy represents the straightforward execution of a clearly articulated policy: on January 20, 2025, President Trump ordered that DHS "rescind [certain] policy decisions of the

---

[37] *See* note 26, *supra.*

previous administration."[38]  On January 30, 2025, DHS did so.  Granted that the 2025 Policy itself purports to be only "interim guidance" that "may be modified, rescinded, or superseded at any time."[39]  However, an agency cannot exempt itself from APA review merely by labeling its policy interim "[g]uidance." *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1020–23 (D.C. Cir. 2000). "The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." *Id.* at 1022.  For the same reason, "boilerplate" disclaimers are non-dispositive. *Id.* at 1022–23.  Here, in the absence of any indication that Defendants' position on this issue is "tentative" or otherwise evolving, *cf. Harper*, 118 F.4th at 116, the Court finds it likely that the 2025 Policy constitutes DHS's final word on the matter (at least for now).

As to the second *Bennett* prong, the rescission of the 2021 Policy has had "direct and immediate consequences," at a minimum, for U visa applicants like Plaintiffs.  *See Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*, 208 F.3d 1, 5 (1st Cir. 2000); *see also Regents*, 591 U.S. at 30–31 (acknowledging the "radiat[ing]" consequences of DACA's rescission and rejecting the argument that, "because the DACA Memorandum stated that the program 'conferred no substantive rights,'" DHS was not required to consider the consequences of that rescission).  Notably, in *Benitez v. Wilkinson*, 987 F.3d 46 (1st Cir. 2021), the First Circuit considered a direct predecessor to the 2025 Policy, issued in 2019, and assumed that ICE was "bound" by that "guidance," with rights-based implications for the petitioner in that case.[40]  *Id.* at 56.  Accordingly, the Court concludes that the 2025 Policy is likely final agency action.

---

[38] 90 Fed. Reg. at 8445.

[39] ICE Directive 11005.4 at 4.

[40] *See* note 12, *supra*.

**b.** <u>**Arbitrary and Capricious**</u>

Finally, the Court turns to whether DHS's decision to issue the 2025 Policy, rescinding the 2021 Policy, was arbitrary and capricious.  As noted above, the announcement succinctly stated that "it is the policy of the United States to achieve the 'total and efficient enforcement of [immigration] laws.'"[41]  In turn, it cited an Executive Order more generally addressing "threats to national security and public safety" and the "economic well-being of Americans."[42]

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Courts must uphold even "a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)).  However, "an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem."  *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"Agencies are," of course, "free to change their existing policies." *Encino*, 579 U.S. at 212.  However, "in explaining its changed position, an agency must be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Id.* (quoting *Fox*, 556 U.S. at 515).  Indeed, when an agency is "not writing on a blank slate, it [is] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33 (internal citation and quotation marks omitted).

---

[41] ICE Directive 11005.4 at 2 (quoting 90 Fed. Reg. at 8443).

[42] 90 Fed. Reg. at 8443.

Here, the record currently before the Court indicates that DHS "entirely failed to consider an important aspect of the problem," *see State Farm*, 463 U.S. at 43, indeed one that was specifically and explicitly addressed by Congress through the VTVPA and subsequent legislation—that "women and children who are victims of [violent and sexual] crimes committed against them in the United States must be able to report these crimes to law enforcement and fully participate in the investigation of the crimes committed against them and the prosecution of the perpetrators of such crimes."[43]  Nowhere does DHS seem to recognize, let alone address, that withdrawing protections might chill non-citizen cooperation and "[weaken] the ability of law enforcement."[44]  Indeed, DHS seems unaware of the fact that its actions are plainly in tension, following Congress's logic, with the President's expressed concern for "national security and public safety."[45]

DHS highlights its interest in the "total and efficient enforcement of [immigration] laws," yet seems to forget that the VTVPA is one of those laws.  It is worth noting that, in *Regents*, DHS's main argument was that DACA was unlawful and thus its rescission necessarily reasonable.  *See* 591 U.S. at 25–26.  Here, we are talking about relief programs that are explicitly authorized by Congress.[46]  It is thus unclear how the withdrawal of lawful benefits follows from any law-enforcement priority.[47]  This failure to set out a "reasonably . . . discern[able]" "path" itself renders DHS's action arbitrary and capricious.  *See Fox*, 556 U.S. at 513–14.

---

[43] Pub. L. No. 106-386, § 1513(a)(1)(B), 114 Stat. 1464.

[44] *Id.* § 1513(a)(2)(A).

[45] 90 Fed. Reg. at 8443.

[46] 8 U.S.C. §§ 1184(p)(6), 1227(d).

[47] Even taking at face value the "economic" concerns raised in the Executive Order, it does not follow that the correction would result in removals.  *See Regents*, 591 U.S. at 28–30 (stating that the failure to consider deferral separate from work authorization was "alone" sufficient to hold the rescission of DACA arbitrary and capricious).

There is likewise no indication that DHS was at all "cognizant" of any "serious reliance interests" engendered in the 2021 Policy. *See Encino*, 579 U.S. at 212. Without belaboring the point, it is worth remembering that U visa applicants include crime *victims* who have taken affirmative steps to assist American law enforcement. This Court knows well that can mean putting oneself, as a complaining witness, in a dangerous (or even just uncomfortable) position. It is, of course, true that "DHS has considerable flexibility in carrying out its responsibility," meaning that it might have assessed and weighed the reliance interests at stake in different ways, accommodating or not accommodating them however it can reasonably justify within the bounds of the APA. *See Regents*, 591 U.S. at 31–33. However, the Court has no reason to believe that happened here, and Defendants do not give even a perfunctory suggestion that it did. "Making that difficult decision was the agency's job, but the agency failed to do it." *See id.* at 32.

Based on the preliminary record, the Court finds that the 2025 Policy does not follow from DHS's stated rationale. Moreover, it ignores congressional findings and closes its eyes to the effects on people like Plaintiffs. Each of these would constitute an independent basis to conclude that the issuance of the 2025 Policy was arbitrary and capricious.

### B.    <u>Irreparable Harm</u>

The Court finds that, in the absence of an injunction, Plaintiffs will suffer irreparable harm, including the lost opportunity to receive U visa interim relief. Defendants fault Plaintiffs for their delay in filing this suit. *See* Dkts. 18–19. Under the circumstances, the Court finds this of no consequence. For the past year, Plaintiffs have diligently sought relief, including two actions in this court, and there is no indication that a differently timed lawsuit would have produced any other result.

Defendants further highlight that Plaintiffs have not sought administrative stays of removal from ICE. Dkt. 17 at 19. For their part, Plaintiffs' counsel states that an ICE agent "told him that

20

he should not bother" because they are virtually never granted.  *See* Dkt. 1 ¶ 41.  Given that ICE is free to stay Plaintiffs' removal at any time but appears unwilling, the Court does not find it meaningful that Plaintiffs have not completed this paperwork.[48]

### C.    Balance of the Equities and Public Interest

The Court likewise finds that the balance of equities and public interest weigh in favor of relief.  The Court recognizes that "[t]here is always a public interest in prompt execution of removal orders."  *Nken*, 556 U.S. at 436.  As DHS puts it, the "total and efficient" administration of our laws is generally a public good.[49]

However, as discussed above, giving Plaintiffs the opportunity to receive interim U visa relief would not be inconsistent with our laws—indeed, it would seem to track Congress's intention behind the VTVPA, which benefits the public by encouraging non-citizens to report crime, strengthening law enforcement.  Where Congress has seen fit to speak directly to the public benefit in granting relief to a specific set of non-citizens, including Plaintiffs, the Court finds it appropriate to weigh that interest heavily.

## IV.    Remedy

### A.    Scope

In the APA context, "vacatur is the normal remedy," *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014), and "a stay is the temporary form of vacatur," *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023), *rev'd and remanded on other grounds*

---

[48] Defendants also point out that Plaintiffs have not filed petitions for review with the First Circuit.  *See* Dkt. 17 at 19 n.6.  At the hearing, both parties seemed to agree that Plaintiffs could not now submit a petition, while they were pending motions to reopen, although Defendants suggested that Plaintiffs might have filed petitions between their two motions.  In any event, the Court does not find that Plaintiffs' claim here—challenging the rescission and issuance of a policy under the APA—is of the type that could be "raised efficaciously" in that channel.  *Cf. Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 11 (1st Cir. 2007).

[49] ICE Directive 11005.4 at 2 (quoting 90 Fed. Reg. at 8443).

*sub nom. FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024). Accordingly, the most natural preliminary relief in this case would arguably be to stay the 2025 Policy in its entirety under 5 U.S.C. § 705.

Nevertheless, the Court finds that a more narrowly tailored preliminary injunction is the appropriate relief at this stage, given Defendants' limited response to the merits issues and because it is the "less drastic remedy" that the Court could employ while still preventing irreparable harm.[50] *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). In crafting that injunction, the Court bears in mind the principles of administrative law that frame Plaintiffs' likely successful claim. In particular, the Court will not "enjoin[] [Defendants] from further immigration enforcement actions until they complete the BFD process." *Cf.* Dkt. 2 at 7. Rather, the Court will simply enjoin Defendants from relying upon the 2025 Policy, including its rescission of the 2021 Policy, with respect to Plaintiffs. That puts Plaintiffs in the exact same position as they were, subject to DHS policy, before the likely unlawful issuance.

### B. __Bond__

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." That said, there is "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion

---

[50] As discussed in Section III(A)(1), a substantial part of Defendants' jurisdictional argument hinges on characterizing Plaintiffs' claims based on their requests for relief. It is somewhat paradoxical that this argument could be avoided by taking the more drastic measure of setting aside (or, for the time being, staying) the 2025 Policy in its entirety, as did, for example, the district court in *Regents*. *See* 591 U.S. at 14, 36. Nevertheless, the Court is mindful that relief should be "narrowly tailored," *Brown v. Trs. of Bos. Univ.*, 891 F.2d 337, 361 (1st Cir. 1989), and therefore has chosen the objectively lesser option. However, if that relief were found to be improper for whatever reason, it continues to seem apparent that a full stay would be an available and proper course.

to dictate the terms of an injunction bond." *Int'l Assoc. of Machinists & Aerospace Workers v. E. Airlines*, 925 F.2d 6, 9 (1st Cir. 1991); *see also Pineda v. Skinner Servs., Inc.*, 22 F.4th 47, 57 (1st Cir. 2021) (concluding that the district court did not abuse its discretion by not requiring low-wage laborers to post a bond).  Here, Defendants have not suggested what "costs [or] damages" might flow from being "wrongfully enjoined" in this case, *see* Dkt. 17 at 20 (quoting Fed. R. Civ. P. 65(c)), and the Court can imagine none.  Accordingly, the Court will not require Plaintiffs to post bond.

## V.    <u>Conclusion</u>

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is GRANTED. Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, the Court hereby PRELIMINARILY ENJOINS Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the 2025 Policy, including its rescission of the 2021 Policy, in any form with respect to Plaintiffs until further order issued by this Court.

**So Ordered.**

/s/ Brian E. Murphy_____
Brian E. Murphy

Dated:  December 4, 2025                    Judge, United States District Court